# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KYLE APPLEBY,

        **Plaintiff,**

v.

**Case No. 17-2101-DDC-GEB**

BOARD OF COUNTY
COMMISSIONERS OF
DOUGLAS COUNTY, KANSAS,

        **Defendant.**

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Kyle Appleby brings this lawsuit against defendant Board of County Commissioners of Douglas County, Kansas, asserting that defendant demoted him from his position with the Douglas County Sheriff's Office based on sex discrimination and as retaliation for sustaining a worker's compensation injury. Plaintiff asserts his sex discrimination claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*. And he asserts his retaliation claim under the Kansas common law prohibiting retaliation based on worker's compensation injuries because it violates public policy.

Defendant has filed a Motion for Summary Judgment, seeking summary judgment against both of plaintiff's claims. Doc. 58. Plaintiff has submitted an Opposition to defendant's motion. Doc. 68. And defendant has filed a Reply. Doc. 73. The matter thus is fully briefed, and after considering the parties' arguments, the court is prepared to rule. For reasons explained below, the court grants defendant's summary judgment motion in part and denies it in part.

## I.      Uncontroverted Facts

The following facts are either stipulated facts taken from the Pretrial Order (Doc. 55), or are uncontroverted and stated in the light most favorable to plaintiff as the non-moving party. *Scott v. Harris*, 550 U.S. 372, 379 (2007).

Plaintiff works for the Douglas County Sheriff's Office ("DCSO") as a Corrections Officer III.  He is assigned to the Douglas County Corrections Facility.  Plaintiff is male, and he holds himself out as gay.

Plaintiff testified that he consistently has met or exceeded expectations in his Corrections Officer performance evaluations.  In 2017, plaintiff was commended by his DCSO supervisor for his quick action to subdue an inmate.

### *Plaintiff's Interactions with Sergeant Moffitt*

When plaintiff began his employment with the DCSO in 2006, Sergeant Moffitt was a Corrections Officer.  Plaintiff worked on the same shift as Sergeant Moffitt.  Plaintiff testified that throughout his career with the DCSO, Sergeant Moffitt treated him horribly.  He bullied plaintiff and made mean comments to him.  Plaintiff always had problems with Sergeant Moffitt.

In 2012, Sergeant Moffitt subjected plaintiff to offensive comments about his masculinity several times.  Sergeant Moffitt referred to plaintiff as "fag."  He also repeatedly said that plaintiff had "drag queen eyebrows."

Another DCSO employee, Master Deputy Darcie Holthaus, testified that she heard Sergeant Moffitt make negative comments about male homosexuality on many occasions while he was assigned to the Corrections Division.  Master Deputy Holthaus knows of at least two openly gay lesbians who the DCSO employs.  Master Deputy Holthaus never heard Sergeant

Moffitt make negative comments to either of the two lesbians about their sexuality. Plaintiff complained to Master Deputy Holthaus about Sergeant Moffitt's treatment of him.

Sergeant Moffitt never was plaintiff's direct supervisor during his employment with the DCSO. Yet, plaintiff testified that he had no choice but to follow Sergeant Moffitt's directions because he held the rank of Sergeant.

Plaintiff testified that he never confronted Sergeant Moffitt about his offensive comments. Plaintiff also never reported Sergeant Moffitt's conduct to anyone in the DCSO or by using the mechanism in the Douglas County personnel policy.

*DCSO's Process for Deputy Promotion*

When the DCSO has an opening available for a Deputy position, it will announce that opening and accept applications from individuals seeking the position. The DCSO also requires applicants to take a written test and achieve a score of 70% or better on each section of the test.[1] If an applicant passes the written test, he proceeds to the interview stage. With internal candidates, the DCSO establishes a promotions board. The promotions board interviews each applicant, and the board members rank the applicants. The promotions board then makes a forced ranking, *i.e.*, ranking the applicants collectively from best to worst.

Sheriff Kenneth McGovern is the duly elected Sheriff of Douglas County, Kansas. He has held this position at all times relevant to this lawsuit. Sheriff McGovern has determined that the Lawrence Police Department Basic Recruit Academy ("Academy") is the best available academy for potential Deputies to receive and complete the law enforcement officer training necessary to comply with state law. *See* Kan. Stat. Ann. §§ 74-5601, *et seq.* (Kansas Law

---

[1] By Affidavit, plaintiff asserts that the DCSO now requires a 70% pass rate on the total exam instead of a 70% pass rate on each section of the test. Defendant responds that plaintiff's assertion is inaccurate. This dispute is immaterial because plaintiff concedes that the 70% pass rate on each section was the standard applied when he sought promotion to the Deputy position.

Enforcement Training Act).  For this reason, the DCSO uses the Academy for its potential Deputies to receive the required law enforcement training.

The Academy only admits officers ranked as Deputies.  Because of the Academy's requirement, the DCSO appoints successful applicants to the rank of Deputy but conditions the promotion on successfully completing the Academy.

### *Plaintiff Applies for a Promotion to Deputy*

On September 13, 2013, the DCSO announced that it was seeking applications for an available Deputy position.  Plaintiff then was employed by DCSO as a Corrections Officer.  He applied for the open Deputy position.  Six candidates, including plaintiff, took the written test on October 22 and 24, 2013.  Plaintiff did not score 70% or higher on each section of the test.  So he was not eligible to advance in the application process for that opening.

On August 1, 2014, the DCSO announced another opening for a Deputy position.  Plaintiff (who still was working as a Corrections Officer) applied for the position.  On August 26 and 28, 2014, six candidates, including plaintiff, took the written test.  Plaintiff scored a 70% or higher on each section of the test, making him eligible to advance in the application process.

The DCSO eventually selected plaintiff for the promotion, along with Corrections Officers Haney and Weinmaster.  On May 23, 2015, the DCSO promoted plaintiff to the rank of Deputy.  Plaintiff understood that the Academy required him to hold the rank of Deputy before it would permit him to participate in its law enforcement training program.  Plaintiff also understood that his promotion was contingent upon completing the Academy.  But, in the meantime, plaintiff received the promotion and a corresponding pay increase.

*Plaintiff's Performance at the Academy*

On June 1, 2015, plaintiff began the Academy. The Academy had a structured curriculum that was expected to run about 25 weeks. The Academy's scheduled end date was November 13, 2015. The last week of the Academy is called officer survival week, sometimes referred to as hell week.

On July 22, 2015, plaintiff sustained a back injury during defensive tactics training. He went to the County's healthcare provider, Prompt Care, Lawrence Occupational Services, and received medical treatment for his injury. A physician prescribed plaintiff light duty restrictions for one week, including no physical training and no lifting more than five pounds. Plaintiff missed the Academy's afternoon classes on July 22. But he returned to the Academy the next day.

Sergeant Robert Murry with the Lawrence Police Department told DCSO Captain Buchholz and Undersheriff Martin about plaintiff's back injury on the day it happened. On July 26, 2015, plaintiff returned to Prompt Care, and he asked the physician to modify his medical restrictions to accommodate his training at the Academy. But instead, the physician increased his restrictions to include no running and no lifting more than 25 pounds. From July 26 to July 30, plaintiff was subject to these light duty restrictions.

During the Academy, recruits took written and physical tests. Also, the Academy's instructors placed recruits into various real-life scenarios. Instructors graded the recruits' performance during the scenarios either as a pass or fail. Defendant has submitted grading sheets showing the various scenarios where instructors gave plaintiff a failing grade. Doc. 60-17 at 1–20.

Captain William Cory is employed by the Lawrence Police Department, and he has served as an instructor at the Academy. Captain Cory was present for three days of officer survival week when plaintiff attended the Academy. Captain Cory observed that plaintiff lacked a requisite level of physical fitness. He saw that plaintiff was struggling on the very first run, and "it didn't get better from there." Doc. 60-7 at 4 (Cory Dep. 13:5–13). Captain Cory also watched plaintiff perform a scenario that involved recruits removing a subject from a restroom at a bar. Plaintiff was the secondary unit—or back unit—assigned to the scenario. Captain Cory saw that plaintiff was not engaging, meaning that he was not getting into the bathroom to assist his fellow recruits. Accordingly to Captain Cory, plaintiff did not demonstrate the skills necessary to take control of the situation presented by the scenario. Captain Cory testified that plaintiff's performance caused him to fear that plaintiff was a danger to himself, other officers, and the general public.

Captain Cory wrote an Officer's Special Report, documenting his observations of plaintiff's performance at the Academy. Doc. 60-16 at 1–2. His Report opines that plaintiff was not functioning at the level required to work as an effective and safe Deputy. *Id*. Before he wrote the Officer's Special Report, Captain Cory did not know that plaintiff had injured his back during an earlier training at the Academy. Also, Captain Cory did not know that plaintiff is gay. Captain Cory always instructed trainers at the Academy to take good notes during officer survival week. And, if a recruit was having trouble with the training, Captain Cory instructed trainers to write a summary. He gave these instructions about any recruit—not specifically plaintiff.

Officer Josh Guile is employed by the Lawrence Police Department. In 2015, Officer Guile was an Academy instructor, teaching vehicle stops. Officer Guile observed several

scenarios where, he believed, plaintiff failed to perform properly. The first scenario involved a vehicle stop with drugs in the car. According to Officer Guile, plaintiff saw the drugs but didn't take any action. Plaintiff twice walked away from the vehicle, allowing the occupant role players to hide the drugs. Plaintiff appeared flustered, but he did not take any action until the backup unit arrived. Ultimately, plaintiff arrested the role players for possessing drugs, but he never collected the drugs as evidence. Plaintiff testified about this scenario. He explained that he saw the drugs, but did not take any action because he thought he should wait for back up to arrive. Plaintiff thought the Academy was a place to "mess up" and "make the wrong choice" but "[t]he whole point is to learn." Doc. 69-2 at 28 (Appleby Dep. 107:5–108:4).

In another scenario that Officer Guile observed, plaintiff was the primary officer responding to a vehicle stop. (The primary officer is the one taking the lead in the scenario.) The role players drove away quickly to execute a driver's switch. Plaintiff didn't see the driver switch. When the car stopped, plaintiff drew his firearm and ordered the driver to step out of the vehicle. The driver did so with his hands up, but plaintiff never followed up. Instead, plaintiff holstered his gun and stood next to the driver, not knowing whether the driver was armed. Plaintiff never patted down the driver. Also, he never placed him in handcuffs. Officer Guile described plaintiff's actions—*i.e.*, failing to determine whether an individual involved in a car chase was carrying a weapon—as unsafe. Officer Guile thought plaintiff could have been hurt or killed.

Officer Guile observed another scenario where plaintiff was the backing officer (*i.e.*, the officer providing back-up to the primary officer). The primary officer was trying to arrest the role player on a warrant. But the two officers did not have control of the person, and a fight ensued. According to Officer Guile, plaintiff didn't use the proper defensive tactics to gain

control.  Plaintiff also didn't show a sense of urgency compared to the other recruit performing the scenario.

In another scenario, Officer Guile observed plaintiff playing the role as the primary officer on a vehicle stop.  The role player driver exited the car and immediately began shooting a weapon.  According to Officer Guile, plaintiff did not get out of his vehicle quickly and didn't draw his firearm quickly.  When plaintiff finally drew his firearm, the suspect already had emptied his weapon.  Officer Guile testified that, in a real-world situation, the suspect would have shot plaintiff multiple times.  Plaintiff testified that he does not recall Officer Guile discussing his criticisms of plaintiff's performance with him.

Officer Guile testified that he would not have recommended plaintiff complete the Academy or move on to Deputy status.  Officer Guile did not know that plaintiff had injured his back during a training at the Academy.  But he noticed that plaintiff appeared to be in pain during one of the scenarios.

Officer Kevin Henderson is employed by the Lawrence Police Department.  He was an instructor at the Academy when plaintiff attended it.  Officer Henderson taught car stops, and he personally observed plaintiff's performance in several scenarios.  He authored an Officer's Special Report, criticizing plaintiff's performance at the Academy and opining that plaintiff's deficient skills presented a danger to himself, other officers, and the public.  Doc. 60-19.

In one scenario, Officer Henderson observed plaintiff perform a vehicle stop where the occupant had an outstanding warrant.  While stopping the vehicle, plaintiff used the patrol car's public address system instead of the radio microphone to report the stop.  It also took plaintiff several approaches to the stopped vehicle to gather necessary information—*i.e.*, plaintiff returned

to his patrol car several times without required information, thus requiring him to return to the stopped vehicle to get the appropriate information.

In another scenario, Officer Henderson watched plaintiff perform a vehicle stop where the occupants left narcotics in plain view. Plaintiff never saw the narcotics, and the occupant eventually threw them out of the vehicle. Earlier in the Academy, plaintiff had received classroom training about this scenario. He received that training before performing the real-world scenario.

Officer Henderson observed plaintiff perform another scenario involving a vehicle with several occupants leaving a bar. Plaintiff was the backing officer in this scenario. Officer Henderson watched plaintiff stand at the back of the vehicle without doing anything to assist the other recruits with the stop. When plaintiff attempted to handcuff one of the vehicle's occupants, he used the wrong technique. Plaintiff's poor handcuffing led the occupant role player to start a fight. The instructors had told role players not to fight the recruits if they used proper handcuffing techniques. According to Officer Henderson, instructors try to give as much feedback to all recruits—including plaintiff—about how they performed so that they can improve.

In another scenario, Officer Henderson observed plaintiff perform a vehicle stop where he failed to call in the stop on his radio. Officer Henderson explained that not calling in a car stop is dangerous. Plaintiff also failed to separate the occupants of the vehicle when he was asking them for information. Officer Henderson explained that separation is important in a criminal investigation because people generally don't talk when they are around others.

Officer Henderson watched plaintiff perform another scenario involving a car stop where the occupant had an outstanding warrant. On plaintiff's first approach to the vehicle, he failed to

get the passenger's identification. So, plaintiff had to return to the vehicle to get that information. But then, the occupant got out of the vehicle and ran. Plaintiff pursued him and tried to use his baton, but Officer Henderson testified that plaintiff's baton strikes were ineffective because he was not using enough force.[2] Another recruit joined plaintiff and took down the subject. The other recruit then had to prompt plaintiff about the actions he should take.

Over the various weeks that Officer Henderson conducted the vehicle stop training, he never saw any improvement in plaintiff's performance. Officer Henderson saw plaintiff continue to make the same mistakes. And he never saw plaintiff begin to grasp the tasks involved in a vehicle stop or recognize the dangers associated with them. Officer Henderson testified that he would not have felt comfortable with plaintiff serving as a Deputy.

Officer Henderson testified that Captain Cory asked him to write a report about plaintiff's performance in the Academy. He did not ask Officer Henderson to write reports about any other recruits. But no one ever encouraged Officer Henderson to write a negative report about plaintiff. Officer Henderson did not know that plaintiff had injured his back during training at the Academy. Officer Henderson once heard someone discuss plaintiff's sexual orientation but it was not derogatory and not of concern to Officer Henderson.

Officer Chris Wech is employed by the Lawrence Police Department. In 2015, he served as an instructor at the Academy, teaching various techniques. They included defensive tactics, physical conflict resolution, verbal skills, and the mechanics of arrest and handcuffing. During the Academy, Officer Wech provided classroom training to recruits. Afterwards, the recruits would apply that classroom training to scenarios.

---

[2]     Plaintiff tried to controvert this statement of fact by asserting that the recruits used batons made of foam in their training. This fact does not controvert Officer Henderson's testimony that he observed plaintiff's use of the baton in training as lacking the requisite force.

Officer Wech observed plaintiff perform many scenarios during his training at the Academy. In one scenario, Officer Wech saw plaintiff have difficulty controlling his body weight up and down and pushing himself off of the ground. Plaintiff would put his head down and use his weapon hand to push himself off the ground. He also used his body weight to control a role playing suspect which, Officer Wech explained, could cause injury. In another scenario, Officer Wech observed that plaintiff was physically unable to control a role player. Instead, plaintiff resorted to laying on top of the role player using his body weight to control the individual.

Officer Wech also observed plaintiff perform another scenario involving a burglary. Plaintiff attempted to handcuff the role player suspect, but he was physically unable to control the suspect's hands behind his back. Plaintiff then attempted to handcuff the suspect using a technique not taught at the Academy. Eventually, another recruit assisted plaintiff in handcuffing the suspect. After each scenario, including this one, instructors provide a short debrief to recruits. In the debrief, the instructors tell the recruits their concerns about the recruits' performance and advise them of the things they need to correct.

In another scenario involving a civil dispute, Officer Wech observed plaintiff performing well. Officer Wech met with plaintiff and told him that he had done well in this scenario. But he also told plaintiff that he had concerns about his ability to handle other scenarios that, unlike the civil dispute, involve physical control. Officer Wech told plaintiff that he had concerns about plaintiff's ability to protect himself and protect others in the community. Plaintiff testified that he does not recall Officer Wech having conversations with him about his performance.

Overall, Officer Wech had concerns about plaintiff's ability to deal with physical and stressful situations. Although plaintiff performed well in scenarios involving low stress, plaintiff had trouble when the scenarios involved higher stress and required physical contact.

No one ever encouraged Officer Wech to single out plaintiff for negative performance. During officer survival week, Officer Wech helped run the arrest scenarios and evaluated the recruits' performance in those scenarios. Most of Officer Wech's observations of plaintiff's performance happened during officer survival week. During his observations, Officer Wech does not recall any of the other recruits having performance issues like plaintiff had demonstrated.

No one at the DCSO told Officer Wech to write a negative report about plaintiff so that he would not succeed in completing his training at the Academy. Also, no one told Officer Wech to write a negative report about plaintiff because of his sexuality or his back injury. Officer Wech knew that plaintiff had injured his back because he was permitted to sit out of some of the training. But Officer Wech did not know anything specific about that injury. And Officer Wech never heard anyone talk about plaintiff's sexuality during the Academy.

Deputy Phillip Weinmaster is employed by the DCSO. He attended the Academy as a recruit with plaintiff in 2015. During the Academy, Deputy Weinmaster observed plaintiff's performance during a number of scenarios when he served as either a primary or backing officer. Deputy Weinmaster occasionally saw plaintiff struggle physically to complete tasks in the scenarios, including training runs. Deputy Weinmaster recalls that all recruits received constant classroom training and verbal counseling from instructors about each task or scenario. So, he does not believe that instructors singled out plaintiff. Deputy Weinmaster also recalls the

instructors yelling at all of the recruits, particularly during officer survival week, to simulate real life stress.

Sergeant Moffitt worked as an instructor at the Academy during officer survival week. Plaintiff asserts that Sergeant Moffitt singled him out and treated him differently than he treated other recruits at the Academy. Sergeant Moffitt criticized plaintiff more frequently and more severely than he did other recruits. Also, he frequently told plaintiff to quit. One time, Sergeant Moffitt drove alongside plaintiff as he was running, and he began shouting "give up, give up." Plaintiff testified that Sergeant Moffitt pulled his car in front of plaintiff, opened the door, and told him to get in because plaintiff was done.

Plaintiff asserts that he was Sergeant Moffitt's only focus during officer survival week. But Deputy Weinmaster recalls that Sergeant Moffitt also yelled at him and other recruits during officer survival week, encouraging them to quit.[3] Plaintiff never complained to Deputy Weinmaster about the way Sergeant Moffitt was treating him. Deputy Weinmaster recalls just one complaint that plaintiff made: plaintiff reported that Captain Paul Fellers of the Lawrence Police Department told him around the ten-week mark of the Academy that he would fire plaintiff if he was employed by the Lawrence Police Department.

Captain Fellers worked for the Lawrence Police Department until his retirement in March 2016. In 2015, Captain Fellers was responsible for overseeing the Community Services' Division which included the training unit and the Academy. As part of his oversight of the Academy, Captain Fellers did not attend the Academy every day. But, if a recruit was having problems during the Academy, instructors would bring the issue to Captain Fellers's attention, and he would handle it.

---

[3] Officer Guile testified that he never saw any instructors yell at recruits to quit. He conceded that instructors yell at recruits but described it as yelling for encouragement.

In August 2015, Captain Fellers met with plaintiff to discuss his performance at the Academy. Captain Fellers had received feedback from instructors that plaintiff was not performing at the level he should be performing at the Academy's ten-week mark. The purpose of his meeting with plaintiff was to make certain that he was committed to the Academy's learning process and to place him on notice of his deficient performance. Plaintiff testified that Captain Fellers advised him in this meeting—for the first time—that he might not complete the Academy. Plaintiff does not know of any other recruits who had similar conversations about their training with Captain Fellers.

After the August meeting, Captain Fellers continued to receive feedback that plaintiff was not performing well in the Academy. Instructors reported to Captain Fellers that plaintiff had performed poorly in the conflict type-scenarios, plaintiff was not making appropriate decisions, and some questioned whether plaintiff should move forward in the Academy.

On November 6, 2015, Captain Fellers met with plaintiff again. By this time, based on the information reported to Captain Fellers about plaintiff's performance at the Academy, Captain Fellers had formed the opinion that he could not recommend plaintiff to move forward in the Academy. Captain Fellers recalled one report of a scenario where plaintiff was on his back and not doing anything to protect his weapon. So, when meeting with plaintiff on November 6, 2015, Captain Fellers informed plaintiff that he could not recommend him to move on in the Academy.

No one at the DCSO ever contacted Captain Fellers about wanting plaintiff to fail out of the Academy because of his back injury or sexual orientation. Captain Fellers testified that his recommendation about plaintiff was based solely on his poor performance at the Academy.

Before his first meeting with plaintiff, Captain Fellers did not know about plaintiff's sexual orientation. Also, he didn't care personally about plaintiff's sexual orientation.

Plaintiff disagrees that he performed poorly at the Academy. Plaintiff conceded that he had some problems at the beginning of firearm training, but he contends that he corrected those issues. In July 2015, plaintiff scored a 94% on a weapon qualification test. And in August 2015, he scored an 82% on a weapon qualification test. Also, plaintiff testified about another scenario where instructors determined that both he and another recruit had failed to take control of the situation. But, plaintiff asserts, no one took his gun from him during this scenario.

Plaintiff asserts that he was bullied and singled out at the Academy for making mistakes. When other recruits made similar mistakes, instructors did not acknowledge them. Plaintiff also testified that he was subject to remarks about his masculinity at the Academy. He was told to "man up," to use his "male voice," and that he was not "what they appear to be a man [sic] in this job."[4] Doc. 69-2 at 40 (Appleby Dep. 153:6–14). But the only DCSO employee who made these remarks was Sergeant Moffitt. Plaintiff spoke to his fellow recruits Deputies Weinmaster and Haney about his treatment at the Academy. According to plaintiff, they didn't understand why instructors were treating plaintiff in this fashion.

### Plaintiff's Removal from the Academy

Sometime before November 1, 2015, Sheriff McGovern attended a professional conference that members of the Lawrence Police Department Academy training staff attended as well. During a break, the Academy training staff informed Sheriff McGovern that they had

---

[4]     The court is not sure what plaintiff means with this testimony. But, viewing the statement in the light most favorable to plaintiff, the court construes plaintiff's testimony to mean that he was not what they expected of a man in this job.

concerns about plaintiff's performance.[5]  Sheriff McGovern cannot recall the names of the specific individuals who expressed these concerns.  But he recalls that each one expressed concerns about plaintiff's inability to perform the necessary tasks required of a Deputy.  In particular, the training staff members had concerns about plaintiff's ability in the areas of weapons management and engaging criminal suspects.  And each training staff member felt that plaintiff was a danger to himself, other officers, and the public.

Through the chain of command at the Lawrence Police Department, Sheriff McGovern asked for copies of their reviews of plaintiff.  Also, Sheriff McGovern and other DCSO personnel spoke with various instructors who had trained plaintiff at the Academy.  Based on the information Sheriff McGovern received, he made the decision that plaintiff should not complete the Academy.  Instead, Sheriff McGovern decided to return plaintiff to his position as a Corrections Officer.

On November 10, 2015, the DCSO returned plaintiff to his Corrections Officer III position with his previous rate of pay.  Plaintiff is the only recruit in his class who was not allowed to complete the Academy.  He's also the only DCSO employee who has attended, but not completed, the Academy.

---

[5]  Plaintiff objects to this fact as inadmissible hearsay.  Defendant responds that it does not offer the training staff's statements to prove the truth of the matter asserted—*i.e.*, that plaintiff performed poorly at the Academy.  Instead, defendant offers the statements to show Sheriff McGovern's state of mind.  Thus, defendant asserts, the statements are not hearsay.  The court agrees with defendant.  The statements are admissible as an exception under the hearsay rule.  *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993) (holding that statements offered to show an employer's state of mind when making an employment decision are generally not hearsay because they are not offered to prove the truth of the matter asserted).

Sheriff McGovern did not know plaintiff's sexual orientation until he filed this lawsuit.[6] Also, before plaintiff filed this lawsuit, Sheriff McGovern never knew about plaintiff's allegations that DCSO Sergeant Moffitt had made offensive comments to plaintiff and bullied him.  Thus, plaintiff's sexuality and his allegations about Sergeant Moffitt never factored into Sheriff McGovern's decision to remove plaintiff from the Academy and return him to the Corrections Officer position.  Instead, according to Sheriff McGovern, he based his decision on safety issues and his belief that plaintiff lacked the requisite skills to protect himself and others.

Before his demotion, plaintiff never had received any written evaluations or memos about his performance at the Academy other than the written exercises he completed during training. When plaintiff was demoted, he never had seen an Officer's Special Report documenting his training performance.  He did not see any such reports until months later.  Several officers testified that Captain Cory specifically directed them to write reports about plaintiff and that he never gave similar directions about another recruit.  And Captain Fellers testified that he does not routinely compose memoranda or officer's special reports about the performance of recruits in the Academy.

After the DCSO removed plaintiff from the Academy, he filed a grievance.  Following DCSO guidelines, Sheriff McGovern acted as the grievance's Hearing Officer.  At the grievance hearing, plaintiff was represented by legal counsel and was given a full opportunity to grieve the DCSO's decision to remove him from the Academy and return him to his previous position. During the grievance hearing, plaintiff never claimed that the DCSO's decision was based on any of Sergeant Moffitt's conduct, plaintiff's back injury, or his sexual orientation.  Instead, at

---

[6]	Plaintiff tries to controvert this fact by citing his deposition testimony where he testified that he has been openly gay at work since 2008.  But this fact does not establish that *Sheriff McGovern knew* that plaintiff was openly gay at work.  Thus, plaintiff's testimony does not controvert Sheriff McGovern's assertion that he did not know plaintiff is gay until he filed this lawsuit.

the grievance hearing, plaintiff asserted that he had performed adequately at the Academy. Alternatively, plaintiff asked to attend the Kansas Law Enforcement Training Center—a law enforcement training program similar to the Academy. After the hearing concluded, Sheriff McGovern sustained his earlier decision to remove plaintiff from the Academy and return him to his Corrections Officer position.

### *DCSO's Treatment of Katie Benton*

Plaintiff alleges that the DCSO treated him less favorably than a similarly situated female candidate, Katie Benton. Ms. Benton is a former DCSO employee. She first worked as a Corrections Officer and later a Deputy. When she began her employment as a Corrections Officer, the DCSO assigned her to work at the Douglas County Corrections Facility. There, she became friends with plaintiff.

In December 2013, the DCSO promoted Ms. Benton to Deputy, contingent upon her completing the Academy. When Ms. Benton attended the Academy, most of the instructors were Lawrence Police Department employees. But some of the other instructors were DCSO employees. Ms. Benton testified that, during her 25-week attendance at the Academy, the recruits went to class, received instruction on policing policies, engaged in scenario training, and received feedback from the instructors. Ms. Benton testified that she thought instructors were "extra hard" on some recruits—including herself, whom she describes as "girly"—because instructors wanted to make sure that the recruits are "strong enough to get through." Doc. 60-22 at 8 (Benton Dep. 34:13–35:2). Ms. Benton recalled that the instructors put the recruits under increased stress and physical activity during officer survival week. The instructors also yelled a lot at the recruits during this week. Ms. Benton eventually completed and graduated from the Academy.

Before plaintiff attended the Academy, he had several discussions with Ms. Benton about what to expect, including the physical training necessary, the skill testing, and the scenarios. While he attended the Academy, Ms. Benton talked to him constantly by telephone. Ms. Benton recalls that plaintiff told her that he had talked to Captain Fellers, but he never shared the content of that conversation with her. When Ms. Benton attended the Academy in 2014, she recalls that one or two recruits sat out one or two sessions because of an injury. Ms. Benton injured her forearm, and she sat out one session because of it. She believes that another recruit also sat out a session or two because of injury. Ultimately, Ms. Benton's entire class graduated from the Academy.

Plaintiff asserts that he was afraid to complain about how Sergeant Moffitt treated him because, in 2010, the DCSO had threatened him with termination for making a complaint about smelling marijuana on a supervisor. Ms. Benton testified that she and at least one other Corrections Officer smelled marijuana on a supervisor. They talked about it among themselves. Eventually, an officer reported the supervisor, and the DCSO initiated an Internal Affairs Investigation. Investigators interviewed Ms. Benson about the complaint. Before she answered their questions, she was provided a Garrity warning, explaining that she would lose her job if she did not tell the truth or cooperate with the investigation. When the investigation ended, Undersheriff Massey spoke with Ms. Benton and others about stopping the spread of rumors and using the chain of command to report problems at the Douglas County Correctional Facility.

When Ms. Benton worked at the Douglas County Correctional Facility, she knew other employees who were openly gay and lesbian. Plaintiff asserts, however, that he is the only openly gay *male* Corrections Officer.

### DCSO's Treatment of LeRonda Roome

Plaintiff also asserts that the DCSO treated him less favorably than it treated a similarly situated female employee, LeRonda Roome. Plaintiff asserts that Ms. Roome was unable to meet certain physical requirements during her training at the Academy in 2012. But, according to Ms. Roome, instructors did not expect recruits to pass every requirement. Instead, instructors were looking for recruits to show improvement and effort. Ms. Roome completed the program and was allowed to graduate even though she did not meet the required run times.

### DCSO's Treatment of Russell Brooks

DCSO Deputy Russell Brooks attended the Academy in 2016. During his training, he sustained a knee injury. Deputy Brooks was placed on work restrictions and was unable to complete the Academy. As of July 2017, Deputy Brooks's Academy training was on hold subject to him completing the scenario portion of the Academy successfully in November. In 2017, Deputy Brooks entered the Academy again. But he injured his other knee, again preventing him from finishing the Academy. According to Sheriff McGovern, Deputy Brooks is scheduled to complete the portions of the Academy that he has not yet completed in 2018. Deputy Brooks holds himself out as a heterosexual male.

### Plaintiff's Complaints about Sergeant Moffitt

As already described, plaintiff testified that he never reported Sergeant Moffitt's conduct to anyone in the DCSO or using the Douglas County personnel policy mechanism. Later in his deposition though, plaintiff testified that he complained to DCSO Lieutenant Blake McCall during his evaluation on November 2, 2015, about his history with Sergeant McCall (including his offensive comments and how he treated plaintiff during officer survival week).

Lieutenant McCall testified that, on November 2, 2015, he met with plaintiff to discuss his evaluation because Lieutenant McCall previously had served as plaintiff's supervisor. But at the time of the meeting, both Lieutenant McCall and plaintiff were on different assignments. Lieutenant McCall told plaintiff that he liked working with him, and he commented that, if plaintiff was assigned to patrol, he could be assigned to Lieutenant McCall's shift. Plaintiff told Lieutenant McCall that he didn't think he could work on his shift because Sergeant Moffitt also was assigned to that shift. Plaintiff told Lieutenant McCall that he did not get along with Sergeant Moffitt. He said that Sergeant Moffitt treated him differently and picked on him. Lieutenant McCall did not report plaintiff's comments to anyone because, when plaintiff made them, he was no longer plaintiff's supervisor.

### Sergeant Freeman's Comments

Before plaintiff attended the Academy, DCSO Sergeant Freeman also made disparaging comments to plaintiff about his masculinity. He told plaintiff that he was going to start "manning [him] up." Doc. 69-2 (Appleby Dep. 97:10–21). And after plaintiff attended a Britney Spears concert, Sergeant Freeman told him: "That girly shit's not going to happen on my shift." *Id.*

On September 12, 2017—almost two years after plaintiff's removal from the Academy and demotion to Corrections Officer—plaintiff discovered a drawing of a muscular male figure on a dry erase board in a common area of the DCSO. Written next to the figure was the word, "GHEYY." Plaintiff understands this word to mean an intentional misspelling of "gay." Plaintiff found the drawing offensive and took a photograph of it.

*DCSO's Personnel Policy*

In March 2015, Douglas County implemented a Personnel Policy. This policy governed plaintiff's employment with the DCSO. Plaintiff testified that he received a copy of the Personnel Policy in March 2015, looked through it, and tried to familiarize himself with it. But he did not memorize it. Plaintiff knew that if he had questions about the Personnel Policy, he could ask about its meaning. The Personnel Policy includes a statement of non-discrimination. It provides that the County prohibits discrimination, sexual harassment, and retaliation. Plaintiff is certain that he read the non-discrimination statement. He knew that the County prohibits discrimination, sexual harassment, and retaliation. Plaintiff also knew, as a County and DCSO employee, he could report discrimination at any time.

Also, in June 2006, plaintiff received and signed an acknowledgement that he had received the "Douglas County Harassment-Free Workplace Policy." The Personnel Policy also includes the Harassment-Free Work Place Policy. And, in October 2011, plaintiff signed the DCSO's "Productive Work Environment Advisory." Doc. 60-14. The Advisory asks the following question: "Are you aware of the Douglas County Sheriff's Office strong commitment to a productive work place absolutely free of any form of sexual harassment or discrimination, racial harassment or discrimination, or any other similar social personal or professional coercion?" *Id.* at 1. Plaintiff checked the "yes" box and wrote "yes" under the comments section of the form. *Id.*

## II.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the court views the evidence and draws

inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## III.     Analysis

Defendant seeks summary judgment against both of plaintiff's claims.  In its summary judgment motion, defendant asserts several arguments.  First, defendant argues that the Board of County Commissioners of Douglas County, Kansas is not the appropriate defendant because it was not responsible for changing plaintiff's employment status.  Second, defendant asserts that plaintiff's Title VII claim fails as a matter of law because no reasonable jury could conclude from the undisputed summary judgment facts that defendant discriminated against plaintiff based on gender stereotyping.  Finally, defendant asserts that plaintiff's state law retaliatory demotion claim fails as a matter of law, or alternatively, the court should decline to exercise supplemental jurisdiction over that claim.  The court addresses each argument in turn, below.

### A.     Has Plaintiff Asserted a Viable Claim against the Board?

Defendant contends that the Board of County Commissioners of Douglas County, Kansas is not a proper defendant because a county board of commissioners has no responsibility over a sheriff's department and, thus, no vicarious liability for a sheriff's employment practices.  *See Blume v. Meneley*, 283 F. Supp. 2d 1171, 1175 (D. Kan. 2003) (Murguia, J.) (holding that the county was the proper party defendant—not the county board of commissioners—because, under Kansas law, the board "clearly did not have oversight over the actions of [the county sheriff]").

But, in a more recent case, Judge Murguia recognized that a plaintiff deliberately had named a board of county commissioners as a defendant in "an attempt to comply with Kan. Stat. Ann. § 19-105, which provides that all suits against a county should be brought against the Board of County Commissioners."  *Vaughan v. Ellis Cty.*, No. 13-2283-CM, 2014 WL 910125, at *2 (D. Kan. Mar. 10, 2014); *see also* Kan. Stat. Ann. § 19-105 ("In all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be 'The board of county

commissioners of the county of _____[.]'"). In *Vaughan*, plaintiff alleged that Ellis County was his employer and that it had violated the Americans with Disabilities Act. *Id.* But, instead of naming the county as a defendant, plaintiff named the board of county commissioners to comply with Kan. Stat. Ann. § 19-105. *Id.* Judge Murguia held: "In light of Kan. Stat. Ann. § 19-105 . . . plaintiff has properly named defendant Ellis County and its Representatives, the Board of County Commissioners of Ellis County, in this lawsuit" because "plaintiff [did not have] any other option, as he must name his employer under the ADA—not an individual defendant." *Id.*

Similarly here, plaintiff asserts that defendant is his employer. Doc. 55 at 7 (Pretrial Order ¶ 3.a.). And he claims that the DCSO violated Title VII and Kansas public policy by removing him from the Academy and demoting him from the Deputy position. *Id.* at 16 (Pretrial Order ¶ 4.a.). Because plaintiff must name his employer as a defendant in a Title VII lawsuit[7] and the Kansas statute directs him to sue the board of county commissioners in any suit brought against a county, the court concludes that plaintiff properly has named the Board of County Commissioners of Douglas County, Kansas as a defendant in this lawsuit. The court denies this portion of defendant's summary judgment motion.

### B. Plaintiff's Title VII Demotion Claim

Defendant next asserts that plaintiff's Title VII claim fails as a matter of law because the undisputed summary judgment facts present no triable issue whether defendant removed plaintiff from the Academy and demoted him from the Deputy position based on sex discrimination. Plaintiff asserts that defendant violated Title VII by "subject[ing him] to sex stereotyping due to

---

[7]     Title VII prohibits an "employer" from discriminating against an individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1); *see also Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996) (holding that Title VII "statutory liability is appropriately borne by employers, not individual supervisors").

his perceived failure to conform to stereotypical gender norms." Doc. 55 at 16 (Pretrial Order ¶ 4.a.). More specifically, his Complaint alleges that "Plaintiff was perceived by Defendant to be insufficiently masculine in his actions according to Defendant's perception of masculinity and established gender roles." Doc. 1 at 8 (Compl. ¶ 55). As a result, plaintiff alleges, defendant "treated [him] unfavorably, and less favorably than one or more similarly situated females employed by Defendant, and said unfavorable treatment was based on plaintiff's sex, male." *Id.* (Compl. ¶ 57).

A plaintiff may assert a Title VII claim for unlawful gender stereotyping based on an employer's discrimination "against [the plaintiff] based on [his] failure to confirm to stereotypical gender norms." *Potter v. Synerlink Corp.*, 562 F. App'x 665, 674 (10th Cir. 2014) (first citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), *superseded on other grounds by statute*, 42 U.S.C. § 2000e-2(m), *as recognized in Burrage v. United States*, 571 U.S. 204, 213 n.4 (2014); then citing *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1223 (10th Cir. 2007)). *See also Etsitty*, 502 F.3d at 1224 (assuming, without deciding, that plaintiff could assert a Title VII claim based on gender stereotyping but declining to decide whether "discrimination based on an employee's failure to conform to sex stereotypes always constitutes discrimination 'because of sex'" and "whether such a claim may extend Title VII protection to transsexuals who act and appear as a member of the opposite sex").

With no direct evidence of discrimination, the court applies the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (citing *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011)). First, the plaintiff must establish a prima facie case of discrimination. *Id.* This requires a showing that: "(1) [he] is a member of a protected class, (2)

[he] suffered an adverse employment action, (3) [he] qualified for the position at issue, and (4) [he] was treated less favorably than others not in the protected class." *Id.* (citing *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998)); *see also DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017); *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1166 & n.8 (10th Cir. 2007).

Next, if plaintiff satisfies this prima facie burden, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Crowe*, 649 F.3d at 1195. And, last, where defendant satisfies plaintiff's burden, the burden shifts back to plaintiff to show that defendant's proffered reasons for its actions are pretextual. *Id.* (citing *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006)).

### 1. Prima Facia Case

Defendant asserts that plaintiff fails to establish a prima facie case of discrimination because the summary judgment facts establish no triable issue whether plaintiff was qualified for the Deputy position. Indeed, the undisputed facts establish that the DCSO's promotion of plaintiff to the Deputy position was contingent upon plaintiff completing the Academy. During plaintiff's attendance at the Academy, many instructors (mostly employed by the Lawrence Police Department, not the DCSO) observed plaintiff's performance and found it deficient. The instructors have cited multiple, specific examples of plaintiff's failure to perform in the scenario training and to meet the physical requirements of the training. Based on their observations, the instructors uniformly concluded that plaintiff was a danger to himself, other officers, and the public. The instructors reported their concerns about plaintiff to Sheriff McGovern. And, based on that information, Sheriff McGovern made the decision that plaintiff should not complete the

Academy. Instead, Sheriff McGovern decided to remove plaintiff from the Deputy position and return him to his former Corrections Officer position.

Plaintiff's Opposition to defendant's summary judgment motion never argues explicitly that he was qualified for the job. But it does assert plaintiff's subjective belief that other recruits made similar mistakes to the ones he made during the Academy yet the other recruits were allowed to graduate from the Academy. Even if plaintiff could make out a prima facie case of discrimination on this summary judgment record, the court concludes below that his Title VII claim cannot survive summary judgment because the undisputed facts fail to present a triable issue whether defendant's decision to demote plaintiff from the Deputy position was pretextual. The court thus assumes, without deciding, that plaintiff has satisfied his prima facie burden.

### 2. Legitimate, Non-Discriminatory Reason

Next, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for plaintiff's removal from the Academy and demotion from the Deputy position. To meet its burden under the second step of the burden-shifting framework, "defendant need only 'explain its actions against the plaintiff in terms that are not facially prohibited by Title VII.'" *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1317 (10th Cir. 1992)). The undisputed facts establish that Sheriff McGovern based his decision to remove plaintiff from the Academy and Deputy position on safety issues and his belief that plaintiff lacked the required skills to protect himself and others. Defendant's proffered reason satisfies its burden under the second step of the burden-shifting frame work.

### 3. Pretext

The burden thus shifts back to plaintiff, requiring him to establish a genuine issue for trial whether defendant's articulated reason was pretext for discrimination. *DePaula v. Easter Seals*

*El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017).  "A plaintiff may show pretext by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'"  *Id.* (citations omitted).  A plaintiff can satisfy this burden "'by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.'"  *Id.* (citing *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013)).

Here, plaintiff points to several facts that, he contends, establish pretext.  The court disagrees.  *First*, plaintiff cannot show pretext by asserting his subjective belief that he performed successfully—or at least as well as other recruits—during the Academy.  The Tenth Circuit has cautioned courts that they "may not second guess the business judgment of the employer."  *Id.* (citing *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017)); *see also Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) ("The courts may not act as a super personnel department that second guesses employers' business judgments." (citation and internal quotation marks omitted)).  "'In determining whether the proffered reason for a decision was pretextual, [the court] examine[s] the facts as they appear to the person making the decision,'" and "'do not look to the plaintiff's subjective evaluation of the situation.'"  *Id.* (quoting *EEOC v. C.R. England*, 644 F.3d 1028, 1044 (10th Cir. 2011)).  "Instead of asking whether the employer's reasons 'were wise, fair or correct,' the relevant inquiry is whether the employer 'honestly believed those reasons and acted in good faith upon those beliefs.'"  *Id.* (quoting *Swackhammer*, 493 F.3d at 1170).

Here, the decisionmaker—Sheriff McGovern—received several reports from Lawrence Police Department officers that plaintiff's performance at the Academy was deficient and posed

a danger to himself, other officers, and the public.  These instructors testified that they based their opinions about plaintiff's performance solely on their observations during the Academy. Many of the officers testified that plaintiff's sexual orientation played no role in their reports, and several officers testified that they never even knew plaintiff is gay.  Also, McGovern did not know plaintiff's sexual orientation until he filed this lawsuit.  Thus, Sheriff McGovern could not have based his decision on plaintiff's failure to conform to stereotypical gender norms.  Instead, as the undisputed facts establish, Sheriff McGovern based his decision on safety issues and his belief that plaintiff lacked the required skills to protect himself and others.

*Second*, plaintiff asserts that a reasonable jury could infer pretext based on the Special Reports that Lawrence Police Department officers completed after plaintiff's demotion.  Plaintiff argues that the Lawrence Police Department officers completed no such reports for any other recruit at the Academy.  The court disagrees.  The undisputed summary judgment facts establish that the instructors found plaintiff's performance deficient at the Academy.  The instructors testified about specific examples where plaintiff failed both to meet physical requirements and to perform successfully in scenario training.  The instructors' testimony is consistent with the observations they documented in their Officer's Special Reports.  Some instructors testified that they did not recall any other recruits having performance issues like plaintiff showed.  And the summary judgment facts reveal no other recruits at the Academy who displayed poor performance similar to plaintiff.  Also, the instructors testified that no one told them to write negative reports about plaintiff.  Instead, the instructors testified that their reports were based on their observations of plaintiff's performance at the Academy and their conclusions that his performance was poor.

Also, plaintiff cannot establish pretext based on timing of the reports. His assertion that the reports establish pretext of gender stereotyping discrimination simply because the officers created them after his demotion is pure speculation. And plaintiff can't establish pretext based on mere speculation. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1237–38 (10th Cir. 2015) (affirming summary judgment against plaintiff's Title VII retaliation claim because plaintiff "merely advanced speculative theories" that failed to demonstrate pretext); *see also Webster v. Shulkin*, 707 F. App'x 535, 542 (10th Cir. 2017) (holding that plaintiff's "claims don't rise above the level of speculation, which is insufficient to demonstrate pretext").

*Third*, plaintiff asserts that he can establish pretext with evidence that defendant treated two similarly-situated females more favorably than it treated him. The court disagrees that these two women were similarly situated to plaintiff. Plaintiff first identifies LeRonda Roome. Ms. Roome was allowed to graduate from the Academy even though she did not meet the required run times. But the summary judgment record contains no evidence that Ms. Roome had performance issues similar to plaintiff's—*i.e.*, failing to meet the physical requirements *and* performing poorly in the scenarios. Thus, the summary judgment facts, even when viewed in plaintiff's favor, won't create a genuine issue whether Ms. Roome is similarly-situated to plaintiff.

Plaintiff next identifies Katie Benton as a similarly-situated woman who defendant treated more favorably than him. But Ms. Benton testified that instructors treated her the same way that plaintiff alleges they treated him. She said she thought the instructors were "extra hard" on her because, she thought, they wanted to make sure that she was "strong enough to get through." Doc. 60-22 at 8 (Benton Dep. 34:13–35:2). She also testified that the instructors put the recruits under increased stress and physical activity during officer survival week and that

they yelled a lot at the recruits during this week. Unlike plaintiff, Ms. Benton completed and graduated from the Academy. But the summary judgment record contains no evidence that she had performance problems similar to plaintiff's. Thus, the summary judgment facts present no triable issue whether Ms. Benton was similarly situated to plaintiff. Consequently, plaintiff cannot show pretext based on defendant's treatment of either Ms. Benton or Ms. Roome.

*Fourth*, plaintiff contends that defendant's treatment of Deputy Russell Brooks (compared to how it treated him) shows pretext. Deputy Brooks is a heterosexual man who attended the Academy in 2016 and 2017. Both times, Deputy Brooks sustained knee injuries and was unable to complete the Academy. Deputy Brooks is scheduled to complete the portions of the Academy that he has not yet completed during 2018. Plaintiff asserts that defendant has treated Deputy Brooks more favorably than it treated him because it never has demoted him from the Deputy position and has given him additional chances to complete the Academy training. But the summary judgment facts viewed in plaintiff's favor don't present a triable issue whether Deputy Brooks is similarly-situated to plaintiff. The summary judgment record contains no evidence showing that Deputy Brooks had performance problems at the Academy similar to plaintiff's. Instead, Deputy Brooks's knee injuries are the only reason that he could not complete the Academy. In contrast, defendant removed plaintiff from the Academy because it determined that plaintiff posed a safety issue and he lacked the skills necessary to work as a Deputy.

*Finally*, plaintiff cannot establish pretext based on offensive comments made by Sergeant Moffitt, Sergeant Freeman, and others. Importantly, plaintiff limits his Title VII claim to disparate treatment that, he asserts, defendant subjected him to during the Academy. Doc. 55 at 16 (Pretrial Order 4.a.). Plaintiff does not assert a hostile work environment or harassment claim based on the alleged offensive comments. And, even if he did, an employer may avoid vicarious

liability through "an affirmative defense—the *Faragher* defense—by showing that the employer 'exercised reasonable care to avoid harassment and to eliminate it when it might occur,' and that the complaining employee 'failed to act with like reasonable care to take advantage of the employer's safeguards.'" *Debord v. Mercy Health Sys. of Kan.*, 737 F.3d 642, 650 (10th Cir. 2013) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998)).

The summary judgment facts establish the first prong of this test. DCSO had written policies prohibiting sexual discrimination and harassment. Plaintiff received these policies and knew that they governed his employment. The summary judgment facts also establish the second prong. Plaintiff concedes that he never complained about Sergeant Moffitt's conduct to anyone in the DCSO and that he never used the Douglas County personnel policy mechanism. He also never complained about Sergeant Moffitt's comments, or asserted that they were the reason for his demotion during the grievance hearing. Instead, plaintiff argued at the grievance hearing that his performance at the Academy was adequate. But, later in plaintiff's deposition, he testified that he complained to DCSO Lieutenant Blake McCall about Sergeant Moffit's conduct during his evaluation on November 2, 2015. But, when plaintiff made the complaint, Lieutenant McCall was not plaintiff's supervisor, and thus, he did not report plaintiff's comments to anyone else.

Plaintiff also asserts that he never complained about Sergeant Moffitt because, he contends, the DCSO threatened him with termination in 2010 when he made a complaint about smelling marijuana on a supervisor. But the summary judgment facts don't support plaintiff's description of this investigation as involving any "threat" by the DCSO. Instead, the summary judgment record, viewed in plaintiff's favor, establishes that DCSO initiated an Internal Affairs Investigation after someone complained about a supervisor smelling of marijuana. Investigators

who interviewed Katie Benson about the complaint provided a Garrity warning, explaining that she would lose her job if she did not tell the truth or cooperate with the investigation. When the investigation ended, Undersheriff Massey spoke with Ms. Benton and others about stopping the spread of rumors and using the chain of command to report problems at the Douglas County Correctional Facility. According to Ms. Benton's testimony, the DCSO expressly encouraged the reporting of complaints but mandated the use of the appropriate chain of command. Also, plaintiff asserts that Sergeant Moffitt treated him poorly throughout his employment with the DCSO which began in 2006. But the Internal Affairs Investigation occurred in 2010. So, even if plaintiff felt that he could not complain about Sergeant Moffitt after the 2010 investigation, plaintiff fails to explain why he never reported Sergeant Moffitt's conduct earlier in his employment.

Sergeant Moffitt's comments also cannot create a triable issue of pretext allowing plaintiff's Title VII discriminatory demotion claim to survive summary judgment. Plaintiff never alleges that Sergeant Moffitt removed him from the Academy, or that he had any input to the decision to demote him from the Deputy position. And the summary judgment facts, viewed in plaintiff's favor, establish that instructors yelled at all recruits—not just plaintiff—especially during officer survival week. So, Sergeant Moffitt's comments cannot create a triable issue whether defendant's decision to remove plaintiff from the Academy was pretext.

The summary judgment facts also fail to show any connection between plaintiff's demotion from the Deputy position and Sergeant Freeman's comments, or the masculine drawing that plaintiff found on a dry erase board in a DCSO common area. Plaintiff identified two comments that Sergeant Freeman made about his masculinity before he attended the Academy. But the summary judgment facts establish no connection between these comments

and plaintiff's removal from the Academy. Nothing in the summary judgment record shows that Sergeant Freeman had any involvement with the Academy, or with the decision to remove plaintiff from that training and demote him from the Deputy position. And plaintiff found the drawing in 2017—almost two years after his demotion. So, it cannot support a triable issue whether defendant's decision in 2015 to remove plaintiff from the Academy was pretext.

For all these reasons, the court concludes that the summary judgment facts, even when viewed in plaintiff's favor, present no triable issue whether defendant's decision to remove plaintiff from the Academy and demote him from the Deputy position was pretext for discrimination based on plaintiff's failure to conform to gender stereotypes. The court thus grants summary judgment against plaintiff's Title VII claim.

### C. Plaintiff's Retaliatory Demotion Claim

Last, plaintiff's second cause of action asserts a claim under Kansas state law. He contends that defendant removed him from the Academy and demoted him from the Deputy position as retaliation for sustaining a worker's compensation injury in violation of Kansas public policy. But, because the court has dismissed plaintiff's federal Title VII claim above, the court may decline to exercise supplemental jurisdiction over plaintiff's remaining state law claim. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction [when] the district court has dismissed all claims over which it has original jurisdiction.").

The decision whether to exercise supplemental jurisdiction is committed to a district court's sound discretion. *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004). Indeed, the Tenth Circuit has expressed the preference that district courts decline jurisdiction over state law claims once it dismisses all federal claims. *See Smith v. City of Enid*

*ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." (emphasis added)). The Supreme Court has directed district courts, when deciding whether to maintain jurisdiction over state law claims, to consider "the values of judicial economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). *See also Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) ("[W]e have said the court should consider retaining state claims when, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction." (citation and internal quotation marks omitted)).

Here, the court has dismissed the only federal claim which this court had original jurisdiction to decide. Exercising its discretion, the court declines to assert supplemental jurisdiction over plaintiff's state law claim. The factors above favor this result. Dismissal of plaintiff's state law claim without prejudice will not waste judicial resources because discovery is complete and the case is ready for a summary judgment ruling by a Kansas court on the claim arising under Kansas law.

This result is not unfair for the plaintiff. Title 28 section 1367 tolls the statute of limitations for state law claims while they are pending in federal court and for 30 days after they are dismissed "unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); *see also Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010). Kansas's "saving statute" affords a plaintiff six months to commence a new action if a previous timely action failed "otherwise than upon the merits." Kan. Stat. Ann. § 60-518. A dismissal "otherwise than upon the merits" includes a dismissal without prejudice. *Rogers v. Williams, Larson, Voss, Strobel & Estes*, 777

P.2d 836, 839 (Kan. 1989).  So, nothing prevents plaintiff from refiling his state law claim in Kansas court, as long as he timely files the claim under the Kansas savings statute.

The Kansas state courts also provide the same level of convenience and fairness as the federal courts.  And, importantly, comity strongly favors remand.  Kansas state courts have a strong interest in deciding matters involving purely state law claims—like plaintiff's retaliatory demotion claim asserted here.  *Brooks*, 614 F.3d at 1230 ("'[N]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.'") (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995)).  Because all the factors favor remand and there is no compelling reason to the contrary, the court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claim.

## IV. Conclusion

For the reasons explained above, the court grants defendant's Motion for Summary Judgment (Doc. 58) in part and denies it in part.  The undisputed summary judgment facts, viewed in plaintiff's favor, present no triable issue whether defendant discriminated against plaintiff based on his sex in violation of Title VII.  The court thus dismisses plaintiff's Title VII claim.  The court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claim.  It thus dismisses without prejudice plaintiff's state law retaliatory demotion claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 58) is granted in part and denied in part.  The court dismisses plaintiff's federal Title VII claim with prejudice.  The court declines to exercise supplemental jurisdiction over plaintiff's state law claim and dismisses the claim without prejudice.

**IT IS SO ORDERED.**

Dated this 2nd day of August, 2018, at Topeka, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge